IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2024

### IN RE CAZ H. ET AL.

**Appeal from the Juvenile Court for Humphreys County**
**No. J-179-23      Haylee Ann Bradley-Maples, Judge**

_____

**No. M2024-00349-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to six children based on abandonment by failure to provide a suitable home and severe abuse. The trial court further concluded that terminating the mother's parental rights was in the children's best interests. Mother appeals. Discerning no error, we affirm the trial court's ruling.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

Jennifer L. Honeycutt, Franklin, Tennessee, for the appellant, Alissa M.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

#### BACKGROUND

Alissa M. ("Mother") appeals the termination of her parental rights to six minor children: D.L.H., I.R.H., C.J.H., L.M.H., L.G.H., and C.L.H. (collectively, "Children").[2]

---

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights in order to protect their privacy and identities.

[2] The trial court also terminated the Children's father's ("Father") parental rights, but Father did not appeal. Father is mentioned only for context.

In February of 2022, the Department of Children's Services ("DCS") filed a petition alleging that all six Children were dependent and neglected. DCS also sought temporary legal custody of the Children based on a referral about environmental neglect, lack of supervision, and severe abuse of the Children. On February 27, 2022, a DCS case manager, responding with law enforcement, found the home where the Children were residing to be messy and with molded food in the refrigerator. Additionally, law enforcement and DCS observed that D.L.H. had significant bruising on both sides of his face, marks on his chin and ears, and a black eye. The parents stated the injuries occurred when another child threw a toy at him. D.L.H. was sent to the emergency room where a physician determined that the injuries and the amount of bruising were inconsistent with the parents' explanation. The physician sent D.L.H. to Vanderbilt Medical Center where tests confirmed the physician's observations. On February 28, 2022, the Juvenile Court for Humphreys County (the "trial court") entered a protective order placing D.L.H. in DCS custody; DCS recommended the remaining Children be placed in DCS custody at an expedited hearing.

At a preliminary hearing for dependency and neglect held on March 1, 2022, both parents were found to be indigent and were appointed counsel. After the guardian ad litem ("GAL") expressed concerns that the remaining Children should not stay in the parents' custody, DCS was ordered to visit the home unannounced four times each week. On March 29, 2022, based on DCS's findings, the trial court found probable cause that the remaining Children were dependent and neglected and ordered that they be placed in DCS custody.

On April 1, 2022, the GAL moved to suspend the parents' supervised visitation based on new allegations of physical and sexual abuse against the Children. L.G.H. and L.M.H. disclosed to their foster mother that they were punished in the parents' home with very hot or very cold baths. The foster mother also observed burns on L.G.H.'s and L.M.H.'s bodies, which L.M.H. explained were cigarette burns. L.G.H. disclosed that her uncle, who lived in the parents' home, made her burn L.M.H. once and that he burned L.G.H.'s private parts and inner thighs. L.M.H. disclosed to the foster mother that she and Mother walked in on Father on top of L.G.H. and that Mother was angry and yelled at Father. L.G.H. confirmed this and told the foster mother that it hurt and she did not like it. The GAL's motion further detailed D.L.H.'s reactions after visiting the parents, which included throwing up and having nightmares; it also stated C.L.H. did not want to see Mother or Father. In April of 2022, the trial court suspended visitation and on May 31, 2022, entered a no-contact order between the parents and Children. It also noted that C.L.H. had been moved to a separate foster home "due to sexual inappropriateness." On February 21, 2023, the trial court adjudicated the remaining Children dependent and neglected and ordered the no-contact order remain in effect. On May 24, 2023, DCS petitioned for termination of Mother and Father's parental rights.

On June 23, 2023, Mother filed an indigency affidavit for the termination of parental rights ("TPR") trial. The affidavit alleged that Mother's job paid $15.10 an hour, Mother

received no governmental assistance or pensions, Mother had a bank account with a $121 balance, and Mother had two credit cards, each with a $300 limit. On July 11, 2023, the trial court held a hearing to set the case for trial. At the hearing, Mother provided additional information, and the trial court found that Mother did not qualify for court-appointed counsel. A July 25, 2023 order reflects that both parents would be allowed time to retain counsel. At a September 12, 2023 status hearing, the trial court again found that Mother was not indigent and instructed her to retain counsel. Trial was set for December 8, 2023. On November 30, 2023, Mother filed a second indigency affidavit. The affidavit stated Mother was working thirty to forty hours a week at $15.10 per hour, that she was paid weekly, that her last paycheck was $575.59, and that her bank account balance was $2.20. Mother also listed expenses of $250 per month for rent, $40 to $50 per week for electric, and $200 to $300 per month for household needs and groceries. Mother provided the names of two attorneys she attempted to contact to represent her.

At the beginning of the trial on December 8, 2023, the trial court asked Mother if she had retained counsel. Mother informed the trial court that she had found someone who would represent her but requested a continuance so the attorney could prepare. The trial court denied Mother's request, finding that Mother had been on notice that she needed to retain counsel for trial since the trial court first denied her request for counsel in the July 25, 2023 order. The trial court subsequently proceeded with the trial with Mother proceeding pro se.

At the final hearing, the trial court heard extensive testimony regarding the physical and sexual abuse of the Children, as well as the unsafe conditions of the parents' home. In addition to the abuse outlined above, Mother testified she was aware Father had tied D.L.H., L.M.H., L.G.H., and C.L.H. up with duct tape on more than one occasion, stating it was a game.[3] Testimony from the foster mother, C.L.H., and a therapist working with some of the Children affirmed that Father had duct taped the Children and left them in the woods. The therapist also testified that L.G.H. disclosed that Father once held a knife to her throat, and L.M.H. disclosed that Mother once put a pillow over her and D.L.H.'s faces.

Further testimony was given regarding the sexual abuse suffered by the Children. For example, the foster mother testified that L.M.H. and L.G.H. disclosed that Father made them put his penis in their mouths. The DCS case manager testified that the Children disclosed that C.L.H. put his penis in L.M.H.'s mouth, and the parents gave him a sucker for doing so. The Children's therapist testified that L.G.H. disclosed that Mother put her fingers in L.G.H.'s rectum. Additionally, at the time of trial, the Children were separated into three different foster homes. L.M.H. and C.L.H. had to be removed from the original home due to concerning, highly sexualized behavior, and I.R.H. was more recently removed so the Children could receive more individualized care.

---

[3] The record is unclear as to whether C.J.H. and I.R.H. were also tied up.

However, testimony by the DCS case manager revealed that the Children had improved overall since being removed from the parents' care. L.G.H., C.J.H., and D.L.H. were bonded with their foster mother, and the DCS case manager believed the Children placed in other foster homes were also bonded with their respective foster families. The Children were also more confident in themselves, had improved in school, and exhibited some normal family dynamics and behaviors. The trial court entered an order on February 6, 2024, finding clear and convincing evidence to terminate the parents' rights to the Children on the grounds of severe abuse and abandonment by failure to provide a suitable home. The trial court further found that termination of the parents' rights was in the Children's best interests.

Mother filed a timely notice of appeal on March 7, 2024. On July 23, 2024, this Court remanded the case to the trial court for the limited purpose of entering a new order compliant with Tennessee Code Annotated section 36-1-113(k). The trial court entered an amended order on August 15, 2024.

## ISSUES

Mother raises one issue on appeal, which we restate slightly:

I.   Whether the trial court erred in declining to appoint Mother counsel based on her indigency affidavit in the termination of parental rights proceedings.[4]

## STANDARD OF REVIEW

Our Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors....' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference

---

[4] While Mother only challenges the trial court's finding that she is not indigent, we are also required to review all statutory grounds for termination found by the trial court. *See In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016).

with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 521–22 (Tenn. 2016). Tennessee Code Annotated section 36-1-113 provides the various grounds for termination of parental rights. *See* Tenn. Code Ann. § 36-1-113(g). "A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky*, 455 U.S. at 769; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process when reviewing parental termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7.

Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Markus E.*, 671 S.W.3d at 457.

## DISCUSSION

### *Denial of Mother's requests for counsel*

The trial court declined to appoint counsel for Mother, finding she was not indigent based on the two affidavits she submitted to the court. Tennessee Supreme Court Rule 13 governs appointment of counsel for indigent parties in termination of parental rights trials. *In re Joshua M.*, No. E2021-01527-COA-R3-PT, 2022 WL 4666232, at *4 (Tenn. Ct. App. Oct. 3, 2022). At the time the petition was filed, Rule 13 provided that

[u]pon inquiry, the court shall make a finding as to the indigency of the party pursuant to the provisions of Tennessee Code Annotated section 40-14-202, which finding shall be evidenced by a court order.

Tenn. Sup. Ct. R. 13(e)(2). During such inquiry, the court shall consider:

(1) [t]he nature of the services to be rendered; (2) [t]he usual and customary charges of an attorney in the community for rendering like or similar services; (3) [t]he income of the accused regardless of source; (4) [t]he poverty level income guidelines compiled and published by the United States [D]epartment of [L]abor; (5) [t]he ownership or equity in any real or personal property; (6) [t]he amount of the appearance or appeal bond, whether the party has been able to obtain release by making bond, and, if the party obtained release by making bond, the amount of money paid and the source of the money; and (7) [a]ny other circumstances presented to the court which are relevant to the issue of indigency.

Tenn. Code Ann. § 40-14-202(c)(1)–(7).

In the present case, Mother submitted two indigency affidavits, one in June and one in November of 2023. Mother stated her hourly wage was $15.10 and that she was paid weekly. In the second affidavit, Mother further provided she worked thirty to forty hours

per week and that her last paycheck was for $575.59.  Mother also provided a list of her itemized expenses: $250 per month for rent, $40 to $50 per week for electric, and $200 to $300 per month for household needs and groceries.  In September of 2023, Mother testified she was not working overtime.  The trial court found in July of 2023 that Mother did not qualify for appointed counsel and re-affirmed this finding during a status hearing in September of 2023.

Finding no error, we affirm the trial court's ruling that Mother was not indigent and, thus, did not qualify for appointed counsel.  Mother stated in her November indigency affidavit that she worked thirty to forty hours per week at $15.10 an hour and that her last paycheck was $575.59.  According to this information, Mother makes approximately $2,000.00 per month.  Mother provided expenses that total approximately $750.00 per month when calculated using the higher value of Mother's approximations.  The approximately $1,250.00 left after expenses establishes that Mother is not indigent and does not qualify for court-appointed counsel.  While Mother argues in her brief that the trial court failed to provide reasoning for denying Mother appointed counsel, we find the trial court's order sufficient, and the record clearly provides that Mother was not indigent. Accordingly, the trial court did not err.

### Grounds for termination

I.    *Severe Child Abuse*

Parental rights may be terminated when

> [t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4).[5]  Severe abuse includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[,]" and "[t]he commission of any act towards the child prohibited by [the statutes] or the knowing failure to protect the child from the commission of any such act towards the child[.]"  Tenn. Code Ann. § 37-1-102(b)(27)(A), (C).

---

[5] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

*a. As pertains to D.L.H., L.G.H., and L.M.H.*

In this case, the trial court entered an order adjudicating D.L.H., L.G.H., and L.M.H. dependent and neglected on February 21, 2023, reasoning that these children were victims of severe abuse. Regarding D.L.H., the trial court noted the bruising and swelling on his body, which was inconsistent with the parents' explanation of the injuries. Regarding L.G.H. and L.M.H., the trial court noted the evidence of cigarette burns on their bodies, as well as testimony that these children disclosed being forced to perform sexual acts on Father and a male sibling, which Mother failed to prevent. The record does not reflect that Mother appealed that order.

As we recently explained,

> "It is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018). This Court has consistently applied the doctrine of res judicata to prevent a parent from re-litigating the issue of severe child abuse in a parental termination proceeding when the finding of severe child abuse has become final. *See In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018); *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016). "[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re Karisah N.*, 2018 WL 6179470, at *10; *In re Dakota C.R.*, 404 S.W.3d 484, 497-98 (Tenn. Ct. App. 2012)).

*In re Quentin G.*, No. E2023-01632-COA-R3-PT, 2024 WL 3324105, at *4 (Tenn. Ct. App. July 8, 2024), *no perm. app. filed*.

Consequently, the issue of whether Mother committed severe abuse as to D.L.H., L.G.H., and L.M.H. is *res judicata* from the dependency and neglect stage. Thus, DCS proved this ground for termination by clear and convincing evidence.[6]

---

[6] Mother does not dispute the severe abuse finding on appeal.

*b. As pertains to I.R.H., C.J.H., and C.L.H.*

I.R.H., C.J.H., and C.L.H. were also found to be victims of severe abuse during the termination phase. *See* Tenn. Code Ann. § 36-1-113(g)(4) (noting that severe abuse can also be found during a termination hearing if a parent "is found[,] by the court hearing the petition to terminate parental rights or the petition for adoption[,] to have committed severe child abuse against any child").

Among other things, testimony during trial revealed Father tied D.L.H., L.M.H., L.G.H., and C.L.H. up with duct tape and left them in a wooded area and that C.L.H. had to cut himself and/or his siblings out of it. Testimony from the foster mother revealed that C.J.H. was forced into "burn[ing]" water and that I.R.H. was filthy and had three bite marks on his bottom when he first arrived at her home. Additional testimony regarding the sexual abuse of the Children revealed that C.L.H. had placed his penis in some of his siblings' mouths. While no evidence revealed that Mother participated in the above-mentioned acts, the trial court found that Mother lived in the home with the minor Children, Father, and the Children's uncle. Based on all the foregoing, we agree with the trial court that Mother knew or should have known the abuse was occurring and failed to protect the Children. Accordingly, the trial court correctly found that DCS proved this ground for termination by clear and convincing evidence.[7]

## II. *Abandonment by Failure to Provide a Suitable Home*

Among other instances, abandonment occurs when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents

---

[7] Mother does not dispute the severe abuse finding on appeal.

or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*)-(*c*).

With this, we "consider[] whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). A suitable home requires "more than a proper physical living location." *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home entails "[a]ppropriate care and attention" for the child and "must be free from drugs." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). DCS must make "reasonable efforts" to assist the parent by doing more than simply providing a list of service providers. *Id*. DCS should utilize its superior resources in assisting with the establishment of a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Jamarcus K.*, No. M2021-01171-COA-R3-PT, 2022 WL 3755383, at *8 (Tenn. Ct. App. Aug. 30, 2022) (quoting *In re Hannah H.*, 2014 WL 2587397, at *9). Sole responsibility does not lie with DCS, and "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child[ren]." *Id*.

In her appellate brief, Mother does not dispute that the Children were legally and physically removed from her care. Nor does she dispute that the Children were abandoned by failure to provide a suitable home. During the dependency and neglect proceedings, the trial court found that the Children were dependent and neglected based on environmental concerns in the home such as roaches, uncleanliness, ruined food and milk, and locks on both the cabinets and refrigerator. In its final ruling on the termination, the trial court found that while the parents may have a physically habitable home for the Children, a physical structure is not in and of itself a suitable home in which the Children could reside. The trial court found that both Mother and Father failed to take responsibility for the actions leading to the Children's removal and failed to acknowledge any abuse suffered by the

Children, and in doing so, effective services could not be implemented to make the home suitable. While DCS made efforts to help the parents make the home suitable, the trial court found it was not possible due to the parents' failure to accept responsibility in the Children's abuse. Indeed, there was no proof at trial that the physical conditions in Mother's home were remedied by the time of trial, and Mother's testimony shows reticence to accept any responsibility for the abuse suffered by the Children. Accordingly, we affirm the trial court's conclusion that DCS proved abandonment by failure to provide a suitable home by Mother.

*Best Interests*

Having determined that two statutory grounds for termination exist, we must determine whether terminating Mother's parental rights serves the Children's best interests.[8] Following a thorough review of the record, we agree with the trial court that it does.

"Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d at 573. As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interests analysis, conflicts between the interests of the parent and child are to be resolved in "favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interests analysis "must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194. Tennessee Code Annotated section 36-1-113(i), which lists factors to be considered as part of the best interests inquiry, states that the trial court "shall consider all relevant and child-centered factors applicable to the particular case before the court." Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of statutory factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White*, 171 S.W.3d at 194).

---

[8] Mother does not dispute the trial court's findings regarding best interests in her appellate brief.

- 11 -

The factors provided by section 36-1-113(i)(1) are as follows:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

In this case, the trial court correctly applied the above factors, providing a detailed best-interests analysis:

(A) This factor does apply to all of the [C]hildren in this case. These [C]hildren were subjected to severe abuse and unpredictable conditions on a

regular basis. All of these [C]hildren have issues that require counseling and guardians that can ensure they receive that counseling. [The foster mother] has had custody of three of the [C]hildren and the therapist testified they are making progress there. [C.L.H.] is bonded with his foster parents as well and is receiving services he needs to continue. The foster parents are providing the stability these [C]hildren need. The parents did not even take [D.L.H.] to the [doctor] when he received a serious head injury. This factor is given great weight.

(B) This factor does apply in this case. It would be detrimental to place these [C]hildren back in the home where they experienced severe physical abuse and sexual abuse, especially with parents that denied that abuse occurred. This factor is given great weight.

(C) This factor does not apply, and is given no weight.

(D) This factor applies in this case. The parents have not been allowed visitation due to the nature of the abuse and their failure to acknowledge it. Therefore, the [C]hildren now have little to no attachment to their parents. For the same reason the parents can't reasonably be expected to form an attachment due to their lack of participation in services. This factor is given great weight.

(E) This factor applies in the case. The parents were not allowed visitation based on their failure to take responsibility for the abuse, and therefore, were not participating in services. This factor is given medium weight.

(F) This factor applies in this case. The [C]hildren that are old enough to express themselves have made statements to the foster parents that they were afraid to go back and want to stay with their current foster families. This factor is given great weight.

(G) This applies to this case. These [C]hildren were burned with cigarettes, duc[t] taped, sexually abused and beaten by their [F]ather and uncle while [M]other failed to protect them. Therefore, it would be triggering to return them to the people that hurt them or let them be hurt. This factor is given great weight.

(H) This factor applies in this case. [The foster mother] has had 3 of the [C]hildren since they were removed. The testimony showed that they love [the foster mother] and are very connected to her. They also call her mom.

[C.L.H.] has been with his foster parents for these two years also and is very connected to them. This factor is given great weight.

(I) This factor applies in this case. [The foster mother] testified that [D.L.H., C.J.H., and L.G.H.] have a relationship with her children and grandchildren. The[y] do not have any other biological relations that are in contact. This factor is given little weight.

(J) This factor applies in this case. The parents have denied all allegations from the beginning. Therefore, they have not participated in any services to rehabilitate themselves. The [C]hildren would be at great risk and be unsafe if returned to the parents. This factor is given great weight.

(K) This factor does apply in this case. The parents have not participated in counseling to address the abuse sustained by the [C]hildren while in their custody. Due to the parents['] denial of abuse and knowledge of abuse[, t]his factor is given medium weight.

(L) This factor applies in this case. The parents['] denial of abuse and knowledge of abuse made it impossible for [DCS] to try to provide services to reunite the family. This factor is given medium weight.

(M) This factor applies in [t]his case. The parents did obtain suitable living quarters, however the larger issue was the physical abuse and sexual abuse. The parents continue to deny abuse or knowledge of abuse. So these circumstances have not been addressed by the parents. This factor is given medium weight.

(N) [T]his factor does not apply in this case.

(O) This factor does apply to this case. Neither parent has custody of any other children. All six of their [C]hildren[,] excluding the very youngest child due to age, have disclosed instances of abuse to their medical professionals or current care givers. This factor is given medium weight.

(P) & (Q) This factor does apply in this case. [Father] admitted to duct taping his [C]hildren in a playful manner and saw no problem with putting duct tape on [C]hildren's skin. [Additionally concerning are] the [C]hildren's disclosures [about] him and the uncle burning L.M.H. and L.G.H. with cigarettes. [M]other was a stay at home mother and denies any abuse occurred, [despite] visible burn marks on [L.M.H.'s and L.G.H.'s skin and [D.L.H.'s] horrific head injuries that were visible at the beginning of the case.

Children can not thrive in an environment where they are abused and no one is protecting them.  This factor is given great weight.

(R) This factor does not apply.

(S) This factor does not apply.

(T) This factor does apply in this case.  Although we don't have mental evaluations of the parents in this case[, t]he facts show that the parents['] mental stability is lacking due to the failure to acknowledge the abuse endured by these [C]hildren or knowledge of the abuse.  This factor is given little weight.

*       *       *

**The court [] finds by clear and convincing evidence that termination of the parental rights of [Mother] is in the best interest of the [C]hildren.**

The record preponderates in favor of the trial court's factual findings regarding the Children's best interests.  The trial court correctly notes that the Children have been with their respective foster families for over two years and are bonded to them.  Many of them have expressed fear at the thought of returning to Mother's home.  Additionally, many of them were proven to have been abused by Father, and Mother allowed the abuse to occur.  Mother does not dispute these findings on appeal.

Consequently, we agree with the trial court that the best interests factors militate heavily in favor of terminating Mother's parental rights, especially considering that we must view the factors from the Children's, rather than Mother's, perspective.  Accordingly, we agree with the trial court's conclusion that terminating Mother's parental rights is in the Children's best interests.  Thus, we affirm the termination of Mother's parental rights overall.

## CONCLUSION

The ruling of the Juvenile Court for Humphreys County is hereby affirmed, and this case is remanded for proceedings consistent with this opinion.  Costs on appeal are assessed to the appellant, Alissa M., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE